Filed 9/26/24  Vargas v. City of Long Beach CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| ALBERTO VARGAS, et al., | B321208 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC675610) |
| v. | |
| CITY OF LONG BEACH, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Respondent. | [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on September 6, 2024, is modified as follows:

On page 32, the second sentence of section IV., is modified to read, "The parties are to bear their own costs on appeal."

This modification changes the judgment.  Plaintiffs' petition for rehearing filed on September 23, 2024, is denied.

_____

BAKER, Acting P. J.        KIM, J.        LEE, J.*

---

\*      Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 9/6/24  Vargas v. City of Long Beach CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE  STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALBERTO VARGAS, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF LONG BEACH,<br><br>    Defendant and Respondent. | B321208<br><br>(Los Angeles County<br>Super. Ct. No. BC675610) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Holly J. Fujie, Judge.  Affirmed.

Law Office of Gregory W. Smith, Gregory W. Smith and Diana Wang Wells, Benedon & Serlin, Douglas G. Benedon and Judith E. Posner, for Plaintiffs and Appellants.

Rutan & Tucker, Samantha Lamm, for Defendant and Respondent.

# I.    INTRODUCTION

Plaintiffs,[1] two former City of Long Beach (the City) police officers, appeal from the judgment entered after the trial court granted summary judgment on their claims against the City for whistleblower retaliation under Labor Code section 1102.5 (section 1102.5) and retaliation under FEHA.[2]  According to plaintiffs, the trial court erred when it:  excluded evidence under the doctrine of issue preclusion; determined the City's motion on their section 1102.5 claim under the wrong legal standard; and concluded that there were no triable issues of fact on their two claims.  We affirm.

# II.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    *Plaintiffs' Prior Litigation*

Vargas began his employment as a police officer for the City in 1994, and Orduno began his employment as an officer in 1999.

In 1997, 2004, and 2006, Vargas sued the City for FEHA violations.  In August 2014 and April 2015, Vargas and Orduno sued the City for FEHA and Labor Code violations, and those two cases were consolidated (consolidated action) and resolved against plaintiffs on summary judgment.  Finally, on March 28,

---

[1]    Plaintiffs are Alberto Vargas and Pablo Orduno.

[2]    FEHA is an acronym for the Fair Employment and Housing Act, Government Code section 12900 et seq.

2017, Vargas filed another action against the City for retaliation under FEHA.

## B.     *Internal Affairs Investigation*

On April 18, 2016—four days after the trial court in the consolidated action issued its order granting the City's summary judgment motion—the City opened an internal affairs investigation into allegations that Vargas and Orduno had made untruthful statements in verified written discovery responses they submitted in support of their claims in that action.

The City's administrative complaint against Vargas listed three allegations of untruthfulness:  (1) in written discovery responses dated May 1, 2015, and December 1, 2015, Vargas was untruthful when he asserted that he had been selected for the role of acting sergeant on multiple occasions prior to complaining about detrimental comments made by Lieutenant Christopher Klein; (2) in written discovery responses dated February 27, 2015, Vargas was untruthful when he asserted that he had previously filed a race discrimination complaint against the City that ended with a judgment in his favor; and (3) in written discovery responses dated April 7, 2016, Vargas was untruthful when he asserted that he was denied further access to overtime. City decision makers sustained the three allegations against Vargas.

The City's administrative complaint against Orduno listed, among others, three allegations of untruthfulness:  (1) in written discovery responses dated February 27, 2015, Orduno was untruthful when he asserted that he had complained about the City's treatment of Vargas and Lieutenant Klein's comments

3

about Vargas; (2) in written discovery responses dated February 27, 2015, Orduno was untruthful when he asserted that he experienced a lack of assistance on traffic stops which was a noticeable difference from the assistance he received prior to being required by the City to wear an audio recorder; and (3) in written discovery responses dated April 7, 2016, Orduno was untruthful when he asserted that he experienced difficulty in complying with the requirement to issue seven traffic violations in a five hour period. City decision makers sustained the three allegations against Orduno.

On April 5, 2017, Vargas and Orduno were notified in writing that the allegations of untruthfulness against them had been sustained. On May 23, 2017, Vargas and Orduno were both notified in writing that they had been dismissed from their employment as police officers with the City.

C.    *Instant Complaint*

On September 13, 2017, plaintiffs filed the instant complaint against the City asserting causes of action for retaliation in violation of FEHA (Gov. Code, § 12940, subdivisions (a) and (h)) and violation of the whistleblower protections provided by section 1102.5.

In their FEHA claim, plaintiffs alleged that: (1) "In or about 2004, 2006, 2015, and 2017, . . . Vargas filed separate and distinct FEHA Discrimination and/or Retaliation cases and actively participated in litigation against the City . . . . Vargas also acted in the capacity of a witness and testified on behalf of Orduno in his FEHA case"; (2) "[i]n or about 2015, . . . Orduno filed a FEHA [r]etaliation case against the City . . . . Orduno also

4

acted in the capacity of a witness and testified on behalf of Vargas in his FEHA case"; (3) "[a]s a result of multiple filings and lawsuits by Vargas pursuant to [FEHA], . . . the testimony of Vargas on behalf of Orduno in the 2015 FEHA lawsuit, and engaging in other protected activities as described above, the [City] retaliated against . . . Vargas by wrongfully terminating him"; and (4) "[a]s a result of filing a DFEH Complaint pursuant to [FEHA], testifying on behalf of Vargas, and being associated with Vargas, . . . Orduno was wrongfully terminated by the City . . . ."

In their section 1102.5 cause of action, plaintiffs alleged that: "[The City] retaliated against [them] for filing, engaging in litigation, and testifying in litigation as authorized by . . . Government Code section 12940 et seq. Said retaliation was based upon [p]laintiffs' disclosure of . . . Government Code section 12940 violations and because [p]laintiffs refused to refrain from filing claims against the City . . . for violations [of] . . . Government Code section 12940." (Emphasis omitted.) Their disclosures were legally protected activities under section 1102.5 and Labor Code section 1102.6 as they "had reasonable cause to believe" the information reported violated Government Code section 12940. The City retaliated against them by wrongfully terminating their employment.

D. *Summary Judgment Proceedings*

1.  The City's Motion

On August 31, 2021, the City filed a motion for summary judgment, arguing that there was no merit to the FEHA

5

retaliation claim because plaintiffs could not show they had engaged in protected activities under FEHA. According to the City, Vargas's 2004 and 2006 lawsuits were too remote in time to support an inference of retaliation and plaintiffs did not have an objectively reasonable belief that, by filing the consolidated action,[3] they were reporting FEHA violations. They also argued that the doctrine of issue preclusion barred plaintiffs from relitigating the issues that were decided against them in the consolidated action.

The City also maintained that the section 1102.5 claim had no merit for similar reasons, namely, that plaintiffs could not show an objectively reasonable belief that, in pursuing the consolidated actions, they were engaging in activity protected by the whistleblower provisions of that statute.

In addition, the City asserted that there was no causal link between plaintiffs' activities and their terminations; it had independent and nonretaliatory reasons for terminating plaintiffs; and plaintiffs could not show the City's reasons were pretextual.

### 2. The City's Evidence

The City supported its motion with, among other evidence, plaintiffs' interrogatory responses and contradictory deposition testimony that the City decision makers considered in sustaining

---

[3] The City also argued that Vargas could not have had a reasonable belief that the City decided to terminate him on March 29, 2017, in retaliation for his act of filing of the 2017 lawsuit, which he filed just one day earlier on March 28, 2017.

6

the allegations of untruthfulness and declarations from the City's Chief of Police, Robert Luna, and Commander Jeff Berkenkamp.

### a. Discovery Responses and Testimony

In supplemental responses to special interrogatories, set one, dated May 1, 2015, and verified responses to special interrogatories, set two, dated December 1, 2015, Vargas stated that prior to complaining about Lieutenant Klein's detriment comments in February 2014, he "was selected for the acting sergeant role on a multitude of occasions; thus demonstrating that he [was] qualified to fill that position." The verification form attached to the responses to special interrogatories, set two, bore Vargas's signature and was undated. By signing the form, Vargas declared under penalty of perjury that he had read the responses, knew of their contents, and the responses were true. But, he later testified in deposition that he never served in the role of acting sergeant during his employment with the City, had never spoken to anyone about the process involved in being selected to serve in that role, and had never asked to be assigned to serve in that position.

In verified responses to form interrogatories dated February 27, 2015, Vargas stated that "[i]n or about 2008, [he] filed a race/national origin lawsuit against the [City], and it concluded with a judgment in his favor." The verification form attached to the responses bore Vargas's signature and was dated February 27, 2015. By signing the form, Vargas declared under penalty of perjury that he had read the responses, knew of their contents, and the responses were true. It was undisputed,

7

however, that prior to the consolidated action, Vargas had never filed a race or national origin lawsuit against the City.

In verified responses to supplemental interrogatories dated April 7, 2016, Vargas stated multiple times that he was denied access to grant overtime. The verification form attached to the interrogatories bore Vargas's signature and was dated April 7, 2016. By signing the form, Vargas declared under penalty of perjury that he had read the responses, knew of their contents, and the responses were true. In his deposition, when asked if he had been denied grant overtime, Vargas answered, "No." He also confirmed that on the one occasion when other officers were offered extra grant overtime of which he was not aware, the sergeant in charge of making those assignments offered him four slots of overtime to make up for it and that he never asked the sergeant if there was any additional grant overtime available or told him that he was interested in additional overtime if it was available.

In Orduno's verified responses to special interrogatories dated February 27, 2015, he stated that he complained to superiors about Lieutenant Klein's alleged statement that Vargas was a detriment. The verification form bore Orduno's signature and was dated February 27, 2015. By signing the form, Orduno declared under penalty of perjury that he had read the responses, knew of their contents, and the responses were true. But in deposition, when asked if he had ever complained to his supervisor about Lieutenant Klein's detriment statement, Orduno explained that he did not complain, as he had nothing to complain about; the statement had not been made about him or his performance. In the same verified responses, Orduno stated multiple times that he experienced a lack of assistance on traffic

stops which was a noticeable difference from the assistance he received before he was required to wear an audio recorder. But in deposition, he testified that, during the six months that the City required him to wear an audio recorder, he never had an incident during which he asked for assistance with a traffic stop and "no one responded to the scene despite [his] request."

Finally, in verified responses to supplemental interrogatories dated April 7, 2016, Orduno stated that he found it difficult to write seven traffic citations in a five-hour period. The verification form bore Orduno's signature, was dated April 7, 2016, and included the same declaration, under penalty of perjury, regarding Orduno's knowledge of the content of the responses and their truthfulness. In his deposition, however, Orduno confirmed that, on average, he would write 12 to 20 citations in a five-hour period; it was not difficult to issue seven or eight citations in a five-hour overtime period; and the number was so low that it was "laughable."

b.      Chief Luna Declaration

According to Chief Luna, the City terminated plaintiffs after an internal affairs investigation determined that, during the consolidated action, they had made untruthful statements and had contradicted those responses in subsequent deposition testimony. He confirmed that the untruthful statements made by plaintiffs were the sole basis of the City's decision to terminate plaintiffs.

Chief Luna also explained that he was appointed to his current position in November 2014, and since that time, in cases in which an internal affairs investigation resulted in a sustained

finding of untruthfulness, it had been his "uniform practice . . . to recommend to the City [m]anager [that] the employee be dismissed."

### c. Berkenkamp Declaration

Commander Berkenkamp explained that he had been assigned to review the investigative materials prepared by the City's internal affairs division and to prepare a letter of transmittal to Chief Luna containing his findings about whether the allegations of untruthfulness against plaintiffs were sustained or not sustained. On March 28, 2017, he submitted his letter of transmittal setting forth his findings and recommending plaintiffs' termination. He based his recommendation on his findings and conclusion that plaintiffs had been untruthful.

Berkenkamp participated in the March 29, 2017, final meeting concerning the internal affairs investigation held in Chief Luna's conference room attended by, among others, Luna, and Deputy Chiefs David Hendricks, Michael Beckman, and Richard Conant. He reviewed with those present his letter of transmittal, the allegations against plaintiffs, his findings, and his recommended disposition of each allegation, that is, sustained or not sustained. When asked by Chief Luna for his recommendation, Berkenkamp replied that he recommended dismissal of both plaintiffs based on the sustained allegations of untruthfulness. The three deputy chiefs all agreed with his recommendation to dismiss plaintiffs because of the sustained allegations of untruthfulness. Chief Luna then announced his decision to dismiss plaintiffs based on the sustained allegations of

10

untruthfulness. On May 17, 2017, the City sent plaintiffs notice of their dismissal.

### 3. Plaintiffs' Opposition

Plaintiffs filed an opposition to the motion, arguing that (1) their prior lawsuits constituted protected activity; (2) the only protected acts upon which they were relying were the prior lawsuits they filed against the City and the acts each of them took during those actions to support the other; (3) on their section 1102.5 claim, the doctrine of issue preclusion did not prevent them from relying on the consolidated action to show that they engaged in protected activity because they had a reasonable and good faith belief that they were reporting FEHA violations; (4) there were triable issues of fact on both claims as to whether their engagement in protected activities was a contributing factor in their terminations; (5) on their section 1102.6 claim, the City failed to carry its burden by clear and convincing evidence that that it would have terminated plaintiffs for independent reasons that were unrelated to their prior lawsuits; (6) they were not collaterally estopped from explaining their interrogatory responses in the consolidated action because the court in that prior matter did not determine that they were untruthful; and (7) the trial court in this action was required to consider their explanations that they did not review or approve the interrogatory responses, that Vargas did not verify the May 1, 2015, response, and that the verification forms were "[p]re-signed".

11

4. <u>Plaintiffs' Evidence</u>

Plaintiffs supported their motion with, among other evidence, deposition excerpts, documentary exhibits, and their own lengthy declarations with exhibits.[4]

a. Vargas Declaration

In his 112 paragraph declaration, Vargas provided the following relevant facts:

i. discovery responses

Vargas addressed each of the statements he made in written discovery in the consolidated action,[5] providing the

---

[4] As explained below, the trial court sustained objections to a substantial portion of the evidence submitted by plaintiffs in opposition to the City's summary judgment motion, and the City contends that plaintiffs do not raise adequate challenges to those objections on appeal. Consistent with our discussion of the court's evidentiary rulings below, we summarize here only (1) those relevant portions of plaintiffs' declarations to which the court did not sustain objections; and (2) those relevant paragraphs of their declarations that were excluded on issue preclusion grounds. Because, however, we will assume for purposes of this appeal that plaintiffs demonstrated that they engaged, or reasonably believed they were engaging, in protected activity when they filed their various complaints, we do not summarize the evidence they offered in support of that element.

[5] Vargas's three statements were: (1) he had been selected for the acting sergeant role on multiple occasions (acting sergeant

following identical explanations for each such statement: His former attorney in the consolidated action, Ronald Zambrano, asked him to "*pre-sign*[ ]" verification forms that did not include the "name of the document reviewed, or the date and location of execution." He did not insert any information on any of the forms and had no knowledge of who inserted the information. He did not expect his former attorney to use the signed forms in connection with any documents without first giving him an opportunity to review and approve the documents.

Other than at his deposition in this action, no one, including attorney Zambrano, gave Vargas the opportunity to correct inaccuracies or approve the subject written discovery responses prior to their submission to the City. He did not communicate with any of his former attorneys concerning the information to be included in the responses at any time prior to their submission.

During the internal affairs investigation, no one from the City asked Vargas: (1) whether he had signed the verification forms or dated them; (2) whether he received, reviewed, and approved the subject discovery responses; (3) whether he communicated with his attorneys about the subject discovery responses prior to their submission to the City; and (4) to explain any discrepancies between his deposition statements and his written discovery responses.

In addition, Vargas provided the following explanations as to the acting sergeant statement: During his deposition in the

statement); (2) in 2008 he had filed a race or national origins lawsuit against the City that resulted in a judgment in his favor (race lawsuit statement); and (3) he had been denied access to grant overtime (grant overtime statement).

13

consolidated action, the City's attorney asked Vargas if he had ever been acting sergeant prior to 2008, and he answered no. Vargas misspoke when answering because the City's attorney was visibly hostile toward him and asked him the question very quickly which led to his confusion. When he reviewed his deposition transcript, he corrected his testimony in an errata sheet in which he stated that he had acted as a sergeant by putting out the patrol watch in the 2000 to 2005 timeframe. In a subsequent deposition, he further explained that, in accordance with common practice, he was considered an acting sergeant on those occasions when he was required to put out the patrol watch due to the unavailability of any more senior officer and conceded that no one told him to assume the role of acting sergeant.

As to the race lawsuit statement, Vargas was truthful with the City's attorney during his deposition in the consolidated action when he explained that he did not recall the years when he filed lawsuits against the City, did not know the type of wordage, terminology, or legal terms used in those suits, and he did not know the legal name of the lawsuit in question. He also pointed out that the City would have access to the records in question.

As to the grant overtime statement, Vargas explained that prior to the filing of the 2014 action, he learned of the existence of a list of secret overtime work opportunities, to which he did not have access, when he saw filled-out overtime slips for times that were not included in the regular overtime lists. When he later discussed the issue with a sergeant, he was shown the list of secret overtime opportunities.

According to Vargas, he testified in his deposition that he was denied access to grant overtime based on the sergeant's secret overtime. After Vargas gave that testimony, he further

14

testified that he was not denied access to grant overtime, referring to the regular grant overtime sign-up meetings at which he was present. His testimony that he was not denied access to grant overtime clearly pertained to the regular grant overtime sign-up meetings that he attended. The City's attorney did not ask him to clarify, and he had no idea that his testimony could be misunderstood or confusing to anyone.

### ii. the internal affairs investigation

As noted, on March 28, 2017, Vargas filed a FEHA claim against the City. On March 31, 2017, in connection with the internal affairs investigation, the City reassigned Vargas, prohibited him from driving City vehicles, and prohibited him from wearing a police uniform in public. As a result of those punitive actions, he learned for the first time that there was an internal affairs investigation against him, but he still did not know the nature of the allegations that triggered it.

The internal affairs investigation resulted in Vargas's dismissal from the City on May 23, 2017. He believed that his dismissal was an act of retaliation by the City for having filed prior lawsuits, for assisting Orduno in the consolidated action, and for testifying in Orduno's favor in that action. He believed that the internal affairs investigation was a set-up because at no time prior to his termination did the City give him copies of the responses to interrogatories forming the basis of the allegations of untruthfulness against him. He also based his belief that his termination was retaliatory on the fact that, following the 2004 action, he was continually singled out by the City for various adverse employment actions and internal affairs investigations

that were not justified by any performance deficiencies or any other legitimate reason.

### b. Orduno Declaration

In his 66-paragraph declaration, Orduna provided the following relevant testimony:

#### i. internal affairs investigation

On April 18, 2016, the City initiated an internal affairs investigation against Orduno and Vargas for alleged untruthfulness and dishonesty in responses to written discovery in the consolidated action.

#### ii. discovery responses

Orduno addressed each of the three verified statements he made in written discovery in the consolidated action,[6] providing the following identical explanations for each such statement: His former attorney in the consolidated action, Ronald Zambrano, asked him to "*pre-sign*[ ]" verification forms that did not include the "name of [the] document reviewed, or the date and location of

---

[6]     Orduno's three statements were: (1) he complained to superiors about Lieutenant Klein's detriment statement (complaint about Klein statement); (2) he experienced a lack of assistance on traffic stops once he was required to wear the recorder (lack of assistance statement); and (3) he found it difficult to issue seven citations in a five-hour time period (seven citations statement).

execution."  He did not insert any information on any of the forms and had no knowledge of who inserted the information.  He did not expect his former attorney to use the signed forms in connection with any documents without first giving him an opportunity to review and approve the documents.  Other than at his deposition in this action, no one, including attorney Zambrano, gave Orduno the opportunity to correct inaccuracies or approve the subject written discovery responses prior to their submission to the City.

During the internal affairs investigation, no one from the City asked Orduno:  (1) about the alleged inconsistencies between the statements in his written discovery responses and his deposition testimony concerning those statements; (2) whether he had signed the verification forms or dated them; (3) whether he received, reviewed, and approved the subject discovery responses; and (4) whether he communicated with his attorneys about the subject discovery responses prior to their submission to the City.

In addition, Orduno provided the following specific explanations as to the complaint about Klein's statement:  In his prior deposition in the consolidated action, Orduno denied "'making a complaint'" about Lieutenant Klein because the City's attorney had asked, "'did you make a complaint'", as opposed to asking "'did you complain'".  Orduno answered in the negative because he understood her question to mean to "'make'" a formal internal affairs complaint about Klein.  He did, however, complain about Klein's "'detriment'" comment, as stated in the interrogatory responses.  Any inconsistency between the interrogatory responses and the deposition testimony was a result of Orduno interpreting the question "'did you make a complaint'" to mean a formal internal affairs complaint.  Orduno

also explained that he never met or communicated with the attorney who signed the interrogatory responses containing the complaint about Klein's statement.

As to the lack of assistance statement, Orduno explained that in his deposition in the consolidated action, he "truthfully testified that [he] *did* receive assistance when [he] requested it in the field even after [the City] required [him] to wear an audio recorder."

And, as to the seven citations statement, Orduno explained that, in his deposition in the consolidated action, he testified that he "had <u>no problem</u> issuing the required citations, and [he] confirmed in [his] deposition in the instant case that [his] prior *deposition* testimony . . . about issuing citations was truthful." He also claimed that the signature on the verification form attached to the interrogatory responses containing his seven citations statement was not his and that he did not believe he signed that form or inserted any of the information on it.

###### c. Other Discovery

Plaintiffs also submitted deposition testimony from Commander Steven Lauricella in which he stated that officers under investigation were usually interviewed during the course of the internal affairs investigation and that it was rare that they were not.

##### 5. The City's Evidentiary Objections

In response to plaintiffs' opposition, the City filed written objections to plaintiffs' evidence, asserting 258 numbered

objections. Each numbered objection asserted multiple grounds for excluding the testimony specified in that objection, including, for example, that the testimony was: barred under the doctrine of issue preclusion; lacking in foundation; not relevant; conclusory; impermissible opinion; and speculation. Not all of the objections, however, included issue preclusion as a ground for exclusion.

### 6. Ruling on Motion

On March 24, 2022, the trial court held a hearing on the City's summary judgment motion and, after taking the matter under submission, issued a written order that same day making the evidentiary rulings discussed below and granting the motion on the grounds that there were no triable issues of fact as to either of plaintiffs' claims.

## III. DISCUSSION

### A. *Standard of Review*

The standard of review for summary judgment is well settled. "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support

the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 (*Aguilar*).)

"In reviewing a grant of summary judgment, we independently evaluate the record, liberally construing the evidence supporting the party opposing the motion, and resolving any doubts in his or her favor. [Citation.] As the moving party, the defendant must show that the plaintiff has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 499–500.)

In conducting its de novo review, the appellate court considers "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Naveger, Inc.* (2001) 26 Cal.4th 465, 476 (*Merrill*).)

B.     *Legal Principles*

1.     Section 1102.5

"Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing to authorities." (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 709 (*Lawson*).) "The purpose of [this statute] is to 'encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation.'" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287.)

In *Lawson, supra*, 12 Cal.5th 703, the court clarified "the applicable framework for litigating and adjudicating section

20

1102.5 whistleblower claims," holding that the provisions of Labor Code section 1102.6 govern that analysis, not the three-part burden shifting construct developed under *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Lawson, supra*, 12 Cal.5th at p. 712.)  The court explained, "[s]ection 1102.6 provides the governing framework for the presentation and evaluation of whistleblower retaliation claims brought under section 1102.5.  First, it places the burden on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action.  The plaintiff need not satisfy *McDonnell Douglas* in order to discharge this burden.  Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." (*Id.* at p. 718.)

### 2.   FEHA Retaliation

Plaintiffs' FEHA retaliation claim is evaluated under the three-part burden shifting construct that has evolved from *McDonnell Douglas, supra*, 411 U.S. 792.  "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.  [Citations.]  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse

21

employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'" and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

C.     *Analysis*

   1.     <u>Evidentiary Rulings</u>

Citing to the standard on review that precludes us from considering evidence that the trial court properly excluded, the City maintains that plaintiffs failed to address adequately in their opening brief the court's adverse evidentiary rulings. According to the City, although the court sustained 176 of its 258 numbered objections, plaintiffs failed to raise a challenge to any of those specific objections, choosing instead to argue generally that the court committed legal error to the extent it sustained the City's objections based on the doctrine of issue preclusion. Because plaintiffs failed to identify specific objections or provide reasoned explanation as to why the court erred in excluding a specific portion of their proffered testimony, the City concludes they waived any challenge on appeal to the court's evidentiary rulings.

For purposes of our analysis, we will assume, without deciding, that (1) plaintiffs adequately preserved their issue-preclusion challenges to the paragraphs of their declarations specified in their opening brief; (2) the trial court erroneously

excluded that testimony relying only on that ground[7]; and (3) the testimony excluded on such grounds should therefore be considered in our analysis of the issues.

    2.    <u>Section 1102.5 Claim</u>

        a.    Failure to Move Under *Lawson* Standard

Plaintiffs contend that the trial court erred when considering the motion on their section 1102.5 claim because the City moved for summary judgment under the wrong standard, namely, the three-part burden shifting construct outlined in *McDonnell Douglas, supra,* 411 U.S. 792. Citing *Scheer v. Regents of the University of California* (2022) 76 Cal.App.5th 904 (*Scheer*), plaintiffs conclude that "the City's failure to use the correct standard in its motion, a mistake the trial court did not address in its ruling, requires reversal of the summary resolution of the section 1102.5 cause of action." We disagree.

---

[7] At page 48, footnote 4, of the opening brief, plaintiffs concede that the trial court excluded other paragraphs of their declarations "for which there was no issue preclusion objection", but they do not adequately address the other grounds upon which those exclusionary rulings were based. We therefore conclude plaintiffs waived any challenges to the exclusion of that testimony and do not consider it in our analysis of the issues. Plaintiffs also concede in their reply that they did not address the trial court's exclusion of certain testimony of Alexander Lawrence, James Willis Morgan, and Berkenkamp in their opening brief. They have thereby waived any reliance upon that testimony on appeal.

Here, unlike in *Scheer, supra,* 76 Cal.App.5th 904, plaintiffs argued in their opposition that the Labor Code section 1102.6 clear and convincing evidence standard should apply to their whistleblower claim and, following the issuance of the decision in *Lawson, supra,* 12 Cal.5th 703, briefed that decision for the trial court *before* the summary judgment hearing. We therefore assume the court followed the *Lawson* analytical framework, and plaintiffs do not affirmatively demonstrate otherwise. (See *Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 981 [The reviewing court is required to presume the order is correct and indulge all presumptions to support it on matters as to which the record is silent. The appellants bear the burden of affirmatively showing error].)

In addition, because we review the trial court's ruling de novo, we can apply the *Lawson, supra,* 12 Cal.5th 703 standard to the evidence in the record on the motion and review the trial court's ruling under the correct analytical framework, without reversing on procedural grounds and remanding for a redetermination of the motion. (See *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 379–380 [trial court decided a summary judgment motion prior to *Lawson*, applying the incorrect three-part standard, and appellate court applied correct *Lawson* standard de novo].)

### b. Plaintiffs' Burden

We first consider whether plaintiffs met their initial burden to establish a case of whistleblower retaliation under section

24

1102.5.[8]  As we discuss above, plaintiffs had the initial burden of establishing, by a preponderance of the evidence, that (1) they engaged in protected activity; (2) they suffered an adverse employment action; and (3) retaliation for the protected activity was a contributing factor in the adverse employment action. (*Lawson, supra*, 12 Cal.5th at p. 718.)

i.      protected activity

To show engagement in protected activity under section 1102.5, subdivision (b), an employee must only produce evidence of a reasonable belief that there was a violation of a statute, regulation, or rule.  (See *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 719 ["under subdivision (b) of section 1102.5 . . . the employee must show only that he or she *reasonably believed* that there was a violation of a statute, rule, or regulation"]; *Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 583 [section 1102.5, subdivision (b) "requires only that an

_____

[8]      Section 1102.5, subdivision (b) provides:  "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

employee disclose information and that the employee reasonably believe the information discloses unlawful activity"].)

We will assume that both plaintiffs presented sufficient evidence showing that, when they filed the consolidated action, they were protesting and seeking redress for perceived violations of their rights under Government Code section 12940, subdivision (h)[9] and, thus, that they established they engaged in protected activity.

### ii.  adverse action

It is undisputed that plaintiffs were subjected to an internal affairs investigation and terminated from their employment.  Those facts were sufficient to satisfy plaintiffs' burden of showing that they were subjected to an adverse employment action.  (See *St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301, 315 [actual discharge is a materially adverse employment action].)

### iii.  contributing factor

"Section 1102.6 requires whistleblower plaintiffs to show that retaliation was a 'contributing factor' in their termination, demotion, or other adverse action.  This means plaintiffs may

---

[9]     Government Code section 12940, subdivision (h) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

26

satisfy their burden of proving unlawful retaliation even when other, legitimate factors also contributed to the adverse action. (See, e.g., *State Comp. Ins. Fund v. Ind. Acc. Com.* (1959) 176 Cal.App.2d 10, 17 . . . [describing a contributing factor standard as one in which the conduct at issue need not be the 'exclusive cause' of the plaintiff's injuries]; *Rookaird v. BNSF Ry. Co.* (9th Cir. 2018) 908 F.3d 451, 461 . . . ["'A 'contributing factor' includes 'any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision'"'].)" (*Lawson, supra*, 12 Cal.5th at pp. 713–714.)

Plaintiffs contend that they met their initial burden of showing, by a preponderance of evidence, that their pursuit of the consolidated action was a contributing factor to their terminations. According to plaintiffs, the timing of the internal affairs investigation against them—four days after the adverse ruling in the consolidated action—together with the City's failure to interview them or provide an opportunity to explain their inconsistent discovery responses, supported a reasonable inference that they were terminated "as a result of [that] action." We disagree.

The timing of the internal affairs investigation does not support a reasonable inference that retaliation for plaintiffs' lawsuits was a contributing factor to the adverse employment action. Beginning in 1997, Vargas filed a total of five prior lawsuits against the City and Orduno filed the first of his two prior lawsuits in 2014. Yet the City did not initiate the internal affairs investigation until years later, in April 2016. Moreover, the written discovery responses which prompted the internal affairs investigation came to light during the summary judgment proceedings in the consolidated action and were expressly relied

27

upon by the trial court in that action in making its April 14, 2016, summary judgment ruling. Thus, the opening of an investigation shortly after the issuance of that ruling does not, by itself, suggest a link between plaintiffs' terminations, over a year later, and their pursuit of the consolidated action. If anything, the timing is inconsistent with an inference of retaliation because once the problematic responses came to light, the City took them seriously by immediately undertaking formal administrative action in response and considering the issue for over a year.

Similarly, the failure of the Department to interview the officers during the internal phase of the investigation, and before the *Skelly* hearings,[10] did not support a reasonable inference of retaliation. Given the serious nature of the allegations of dishonesty and the straightforward evidence that it occurred, a trier of fact could infer little, if anything, from the City's decision to forego interviews.

---

[10] A *Skelly* meeting or hearing refers to the due process rights afforded to public employees prior to adverse employment actions by their employer under *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 (*Skelly*). "'What *Skelly* requires is unambiguous warning that matters have come to a head, coupled with an explicit notice to the employee that he or she now has the opportunity to engage the issue and present the reasons opposing such a disposition. Moreover, the opportunity to respond must come *after* the notice of intention to dismiss.' [Citation.]" (*LaMarr v. Regents of the University of California* (2024) 101 Cal.App.5th 671, 675.)

Here, plaintiffs were each given the opportunity to explain their inconsistent discovery responses at a *Skelly* hearing after their notices of termination, a fact that serves to undercut any inference of retaliation from the City's failure during the investigation to seek such explanations from them.

The serious nature of the dishonest conduct at issue also renders the excuses plaintiffs proffered for the misleading discovery responses implausible. Chief Luna's undisputed testimony established that the City treated any act of untruthfulness by its officers as a terminable offense. Notwithstanding that policy, plaintiffs both maintained that they pre-signed verification forms stating under oath that the matters in "the foregoing document" to which the form was attached were true and "[knew] its contents." But in their subsequent declarations explaining their responses, they maintained that they had no knowledge at the time they made those verifications as to which documents their forms would be attached, much less the content of those documents. Thus, their pre-signing excuse was itself an admission to an act of dishonesty.[11]

In addition, the verification forms had different dates, some of which were handwritten, others of which were typed, and one of which was undated. Those facts contradict plaintiffs' suggestion that they were all signed on the same occasion without any other information included on the forms.

Finally, plaintiffs' assertion that they did not provide any of the information in the discovery responses and did not know who had supplied such information was facially incredible. (See *People v. Schlimbach* (2011) 193 Cal.App.4th 1132, 1142, fn. 9

---

[11] Orduno states in his declaration that the signature on one verification form, attached to the response containing his seven citations statement, does not appear to be his. But even if we assume that testimony raised a triable issue concerning whether he gave false testimony based on that particular statement, he nevertheless admits that he signed the other forms on which the other sustained allegations of dishonesty were based.

29

["trial court may weigh the credibility of a declaration submitted in opposition to a summary judgment motion and grant the motion 'where the declaration is facially so incredible as a matter of law that the moving party otherwise would be entitled to summary judgment.' (*Estate of Housely* (1997) 56 Cal.App.4th 342, 359–360.)"].)  The misstatements in the discovery responses were not created out of whole cloth.  Instead, in many instances, they were consistent with the facts alleged in the complaints filed in the consolidated action, including, for example, Vargas's acting sergeant and race lawsuit statements and Orduna's lack of assistance statement.  Further, the discovery misstatements were included within responses containing other accurate information in terms of the described events, such as Klein's detriment comment and whether plaintiffs were required to wear audio recorders.  There is no plausible explanation for who else, aside from plaintiffs, could have provided that information.  Moreover, plaintiffs' assertion that they did not provide the content of the discovery responses was inconsistent with their suggestion that their later contrary deposition testimony was based on their misunderstanding of a question.  We therefore conclude that plaintiffs did not meet their initial burden to establish, by a preponderance of the evidence, that retaliation for plaintiffs' protected activities was a contributing factor in their adverse employment actions.

30

### 3. FEHA Retaliation Claim

For the reasons discussed above, plaintiffs also did not submit sufficient evidence to satisfy their prima facie burden under their FEHA retaliation claim to show there was a causal link between their protected activities and the adverse action. (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)

## IV.   DISPOSITION

The judgment is affirmed.  The City is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.

LEE, J.*

---

\*      Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32